**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GORDON FLOWERS, *et al*. on Behalf of Himself and Others Similarly Situated, <br><br> Plaintiffs, <br><br> -against- <br><br> UNITED PARCEL SERVICE, INC., <br><br> Defendant. | No. 24-cv-07086 (ENV) (JAM) |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND TO DISMISS THE AMENDED COMPLAINT**

Dated: New York, New York
        May 8, 2025

-i-

ny-2931839

**TABLE OF CONTENTS**

Page

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 4

I.    ALLEGATIONS OF THE AMENDED COMPLAINT.................................................... 4

II.    THE ARBITRATING PLAINTIFFS ......................................................................... 6

    A.    The Arbitrating Plaintiffs Agreed to Arbitrate Their Claims by Enrolling in UPS My Choice. .......................................................................... 7

    B.    The UPS Tariff/Terms Include a Binding Arbitration Provision......................... 10

ARGUMENT ......................................................................................................... 12

I.    THE COURT SHOULD ENFORCE THE ARBITRATING PLAINTIFFS' AGREEMENT TO ARBITRATE THEIR CLAIMS. ....................................................... 12

    A.    The Arbitration Agreement Is Valid and Binding. ............................................. 14

    B.    The UPS My Choice Terms Expressly Incorporate the UPS/Tariff Terms and the UPS Arbitration Provision. ....................................................... 14

    C.    The Arbitrating Plaintiffs' Claims Fall Within the Broad Scope of the Binding Arbitration Agreement ....................................................................... 17

II.    TWO FEDERAL STATUTES INDEPENDENTLY PREEMPT PLAINTIFFS' CLAIMS. ..................................................................................................... 18

    A.    The FAAAA Preempts State Law Claims, Like Plaintiffs', that "Relate to" a Carrier's Routes or Services.................................................................. 19

    B.    The Carmack Amendment Preempts State Law Claims that Arise from Interstate Transportation and Delivery of Goods.................................................. 24

CONCLUSION........................................................................................................ 27

ny-2931839

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*,
685 F.3d 174 (2d Cir. 2012)......................................................................................2

*Abadi v. Am. Airlines, Inc.*
No. 23-cv-4033, 2024 WL 1346437, at *38 (S.D.N.Y. Mar. 29, 2024)..................23

*Am. Airlines v. Wolens*,
513 US 219 (1995)....................................................................................................20

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)..................................................................................................13

*Azzil Granite Materials, LLC v. Canadian Pac. Ry. Co.*,
No. 23-833, 2024 WL 1827289 (2d Cir. Apr. 26, 2024) .........................................25

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015) ......................................................................14

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006)..................................................................................................13

*Daly v. Citigroup Inc.*,
939 F.3d 415 (2d Cir. 2019)...............................................................................12, 17

*Dogbe v. Delta Air Lines, Inc.*,
969 F. Supp. 2d 261 (E.D.N.Y. 2013) ....................................................................19

*Ga., Fla. & Ala. Ry. Co. v. Blish Milling Co.*,
241 U.S. 190 (1916)..................................................................................................24

*Hinojosa v. UPS Expedited Mail Services, Inc.*,
2019 WL 948752 (C.D. Cal. 2019)..........................................................................13

*In re Holl*,
925 F.3d 1076 (9th Cir. 2019) ...........................................................................15, 16

*Lee v. Golf Transportation, Inc.*,
No. 3:21-cv-01948, 2023 WL 7329523 (M.D. Pa. Nov. 7, 2023)...........................20

*Massachusetts Delivery Ass'n v. Coakley*,
769 F.3d 11 (1st Cir. 2014)................................................................................20, 23

ny-2931839

*Miller v. Mercuria Energy Trading, Inc.*,
 291 F. Supp. 3d 509 (S.D.N.Y. 2018), *aff'd*, 774 F. App'x 714 (2d Cir. 2019)......................15

*Morales v. TransWorld Airlines, Inc.*,
 504 US 374 (1992).................................................................................................................20

*N. Shore Linen, Inc. v. Carotenuto*,
 No. 18-cv-04944, 2019 WL 13554614 (E.D.N.Y. Aug. 28, 2019) ...........................................6

*Nw., Inc. v. Ginsberg*,
 572 US 273 (2014).................................................................................................................20

*Pool Deals, LLC v. United Parcel Serv., Inc.*,
 454 F. Supp. 3d 208 (W.D.N.Y. 2020)...................................................................................13

*Project Hope v. M/V IBN SINA*,
 250 F.3d 67 (2d Cir. 2001).....................................................................................................24

*RDK NY Inc. v. City of New York*,
 No. 21-cv-01529, 2024 WL 4333704 (E.D.N.Y. Sept. 28, 2024) ..........................................21

*Rockwell v. United Parcel Serv., Inc.*
 No. 2:99-cv-57, 1999 WL 33100089, at *1–3 (D. Vt. July 7, 1999)..................................21, 22

*Rowe v. N.H. Motor Transp. Ass'n*,
 552 U.S. 364 (2008)...............................................................................................................20

*S & R Dev. Ests., LLC v. Town of Greenburgh, N.Y.*,
 336 F. Supp. 3d 300 (S.D.N.Y. 2018).....................................................................................19

*Schwann v. FedEx Ground Package System, Inc.*,
 813 F.3d 429 (1st Cir. 2016)...................................................................................................20

*Shen v. United Parcel Serv.*,
 No. 2:21-cv-08446, 2022 WL 17886012 (C.D. Cal. Nov. 21, 2022) ......................................13

*Smith v. United Parcel Serv.*,
 296 F.3d 1244 (11th Cir. 2002) .........................................................................................24, 26

*Sollinger v. SmileDirectClub, LLC*,
 No. 19-cv-5977, 2020 WL 774135 (S.D.N.Y. Feb. 18, 2020) ................................................14

*Soly v. UPS*,
 2002 U.S. Dist. LEXIS 24059 (D. Mass. Aug. 22, 2002) .......................................................21

*Spinelli v. Nat'l Football League*,
 96 F. Supp. 3d 81 (S.D.N.Y. 2015).........................................................................................17

ny-2931839

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
  559 U.S. 662 (2010) ..................................................................................................13

*Sugaberry v. United Parcel Serv.*,
  No. 2:21-cv-00610, 2022 WL 910945 (W.D. Wash. Mar. 29, 2022) .......................13

*Trujillo v. Am. Airlines, Inc.*,
  938 F. Supp. 392 (N.D. Tex. 1995), *aff'd sub nom. Trujillo v. Am. Airlines*, 98
  F.3d 1338 (5th Cir. 1996) .........................................................................................22

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
  127 F. Supp. 3d 156 (S.D.N.Y. 2015).........................................................................2

*Wills v. United Parcel Serv.*,
  No. 19-cv-01819, 2019 WL 2929985 (N.D. Cal. July 8, 2019) ...............................19

*Wojcik v. Midland Credit Mgmt., Inc.*,
  No. 18-cv-3628, 2019 WL 3423567 (E.D.N.Y. July 30, 2019)..................................6

**Statutes**

9 U.S.C. § 2 ...................................................................................................................13

49 U.S.C. § 14501(c)(1).............................................................................................19, 23

Airline Deregulation Act of 1978 ("ADA") .................................................................19

Carmack Amendment to the Interstate Commerce Act ("Carmack Amendment")............... *passim*

The Federal Aviation Administration Authorization Act of 1994 ("FAAAA").................... *passim*

**Other Authorities**

H.R. Conf. Rep. No. 103-677 (1994), reprinted in 1994 USCCAN. 1715....................................19

ny-2931839

**INTRODUCTION**

This action fundamentally seeks to direct how United Parcel Service, Inc. ("UPS") provides package delivery service to Plaintiffs' residences.  Some of the Plaintiffs cannot proceed in this Court at all because they agreed to arbitrate all disputes with UPS.  But substantively, *all* of the remaining Plaintiffs' claims are barred as a matter of federal law—under the Federal Aviation Administration Authorization Act ("FAAAA"), which broadly preempts all state law claims that "relate to" a motor carrier's rates, routes, or services, and the Carmack Amendment to the Interstate Commerce Act ("Carmack Amendment"), which provides the exclusive remedy for an interstate motor carrier's failure to deliver packages as agreed.  This is true regardless of how the claims are styled.  Discrimination claims are included within the broad preemptive sweep of federal law and have been held preempted within this Circuit.  The Amended Complaint should therefore be dismissed in its entirety.

*First*, three Plaintiffs— Gordon Flowers, Madeline Brown, and Aminat Fakunle (the "Arbitrating Plaintiffs")—cannot bring their claims in this Court because they entered into valid and enforceable agreements to arbitrate all disputes relating to UPS's services.  Each of the Arbitrating Plaintiffs enrolled in UPS My Choice, which is a service that allows customers to manage and track their shipments online.  In doing so, they checked a box indicating they agreed to be bound by the UPS My Choice Service Terms ("UPS My Choice Terms"), which incorporate the UPS Tariff/Terms and Conditions of Service ("UPS Tariff/Terms") and its provision requiring arbitration of "any controversy or claim, whether at law or equity, arising out of or related to the provision of services by UPS."

Courts routinely enforce the arbitration provision at issue here, including where it is agreed to via assent to the UPS My Choice Terms.  Further, the arbitration provision squarely covers claims like those Plaintiffs assert, which arise from the way UPS delivers packages to the

Arbitrating Plaintiffs' addresses. The Court should therefore compel the Arbitrating Plaintiffs' claims to be brought in arbitration, consistent with the parties' agreements.

*Second*, while the Arbitrating Plaintiffs should be compelled to arbitration, the *entire* Amended Complaint should also be dismissed as preempted under both the FAAAA and the Carmack Amendment. The FAAAA bars Plaintiffs' claims because they challenge a service UPS provides and, specifically, seek to dictate the procedure UPS must follow to deliver Plaintiffs' packages. FAAAA preemption is sweeping, preempting any state law claim "related to" a carrier's rates, routes, or services. Courts—including the U.S. Supreme Court—give the "related to" language in the statute its broad, ordinary meaning and regularly cite it in preempting all manner of state law claims, including state consumer protection enforcement actions to private claims for negligence. Consistent with this approach, courts have not hesitated to find discrimination claims preempted where, as here, they challenge a carrier's service decisions.

To be clear, the claims in this action do not just "*relate to*" UPS's services; they directly challenge the way UPS provides its core service of delivering packages. On average, UPS delivers 22 million packages every day worldwide.[1] To maintain efficient and on-time deliveries, UPS strategically determines the delivery methods for different locations, including

---

[1] *See Company profile*, UPS (last accessed May 5, 2025), https://investors.ups.com/company-profile ("We deliver packages each business day for 1.6 million shipping customers to 10.1 million delivery customers in over 200 countries and territories. In 2024, we delivered an average of 22.4 million packages per day, totaling 5.7 billion packages during the year."). The Court may take judicial notice of these statistics from UPS's website as a public document whose authenticity cannot be questioned. *See 23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174, 183 n.7 (2d Cir. 2012) (taking judicial notice of content of website whose authenticity was not in question); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (acknowledging "the case law applying Rule 201 states that for purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination") (internal quotation marks omitted).

ny-2931839

the delivery end point. There are myriad situations where—as here—UPS delivers packages to a location other than directly to the recipient's door. Operational factors including route efficiency, driver safety, package security, and location density, all determine the type of service UPS elects to provide. Plaintiffs try to cast UPS's operational decisions regarding the service method at their location as UPS discriminating against them. It is not. What UPS *does* do, however, is provide delivery service according to operational conditions that differ from location to location. Federal law reserves such decisions exclusively to the market and applicable federal law—which bars Plaintiffs from asking the Court, as they do here, to override them and declare the service at issue illegal as a matter of state law.

Separately, the Carmack Amendment bars Plaintiffs' claims because it provides the exclusive remedy for claims against motor carriers alleging any type of failure in connection with transportation or delivery. Rather than assert a Carmack Amendment claim, Plaintiffs elected to assert claims under state law. Yet Plaintiffs' entire case is based on UPS's purported failure to deliver packages as agreed, which falls within the preemptive reach of the Carmack Amendment.

Although Plaintiffs attempt to use state and city laws to alter UPS's delivery services to their buildings, both federal laws forbid them from doing so. Accordingly, while the Arbitrating Plaintiffs' claims should be compelled to arbitration, the Amended Complaint should be dismissed in its entirety.

-3-

ny-2931839

**BACKGROUND[2]**

## I.    ALLEGATIONS OF THE AMENDED COMPLAINT

Gordon Flowers, Madeline Brown, Aminat Fakunle, Yvette Perez, Dulcemaria Rivera, Prince Thomas, Jessie Torrence, and Rochelle Torrence (collectively "Plaintiffs") are residents of Park Hill Apartments and Fox Hill Apartments on Staten Island, New York (together, "Park and Fox Hill Apartments"). (Am. Compl. ¶¶ 3–4, ECF No. 16.) Park and Fox Hill Apartments are privately owned but subsidized for low-income renters. (*Id.* ¶¶ 22, 25.) Park Hill Apartments encompasses more than 1,100 units in eight six-story buildings that span about half a mile. (*Id.* ¶ 24.) Fox Hill Apartments includes 362 units in three six-story buildings. (*Id.* ¶ 23.) The two complexes are immediately adjacent to one another along Park Hill Avenue on the northern edge of Staten Island. (*Id.* ¶ 28; Figure A.)

Plaintiffs purport to represent a class of Park and Fox Hill Apartment residents to whom UPS has delivered packages (the "Putative Class Members"). (*Id.* ¶ 81.) In short, all of Plaintiffs' claims challenge UPS's delivery of packages to Park and Fox Hill Apartments addresses at a centralized location at a set time each day. (*Id.* ¶ 30.) According to the Amended Complaint, a UPS truck parks at 240 Park Hill Avenue at a set time (11 a.m.)—within Park Hill Apartments and accessible to Fox Hill Apartments—and UPS workers wait for residents to come retrieve their packages. (*Id.* ¶¶ 30–31; Figure A.) According to the Amended Complaint, the Putative Class Members "are denied the full benefit of UPS's shipping services" and "do not get full benefit of this service for which they have paid" because they do not receive the "same service" that UPS allegedly provides to majority-White buildings. (*Id.* ¶¶ 38, 63.) As a result,

---

[2] The allegations in this background section are drawn from Plaintiffs' Amended Complaint ("Am. Compl.") (ECF No. 16) and are accepted as true only for the purposes of this motion and not otherwise admitted by Defendant.

ny-2931839

the Putative Class Members have allegedly suffered "dignitary harm" by "being forced to wait outside for deliveries." (*Id.* ¶¶ 68, 96, 103.)  Furthermore, Plaintiffs allege they have individually been injured, *inter alia*, by directing UPS packages to a relative's house or waiting for packages "in all weather." (*Id.* ¶¶ 42–49.)

Plaintiffs allege that UPS originally instated this delivery policy at Park and Fox Hill Apartments 30 years ago due to safety incidents. (*Id.* ¶¶ 40, 72.)  From there, Plaintiffs make the analytical leap that the policy has *remained* in place because it is discriminatory, alleging only that there are White recipients who live elsewhere who receive delivery indoors. (*Id.* ¶ 6.) Plaintiffs do not address the delivery conditions at Park and Fox Hill Apartments—for instance, the complexes' significant footprint and number of units, or whether either complex has a central, secured package room. (*Id.*)  Nonetheless, Plaintiffs ask the Court to override UPS's operational decisions and order it to alter the way it provides service to their addresses. (*Id.* at 19.)

In challenging UPS's delivery service, Plaintiffs cite to "similarly situated" "multi-family" Staten Island buildings with "higher proportions of White residents" where UPS purportedly delivers directly to residents. (*Id.* ¶¶ 50–51.)  Yet again, Plaintiffs fail to address delivery conditions at those buildings, instead focusing exclusively on the alleged racial make-up of residents.  For example, Plaintiffs never allege that any of the "similarly situated" "multi-family" buildings are as large as Park and Fox Hill Apartments, whether by footprint or number of units.[3] (*Id.* ¶¶ 51–61.)  Just the same, the Amended Complaint does not address whether Park

---

[3] In fact, Plaintiffs concede that all but one of the "similarly situated buildings" have *fewer* units than Park and Fox Hill Apartments—and Plaintiffs fail to allege how many units are in the remaining building. (*See id.* ¶ 52) (comparing Park and Fox Hill Apartments to "at least five other apartment buildings" without specifying how many units are in those buildings).

and Fox Hill Apartments have the same delivery features as the "similarly situated" buildings—such as whether these buildings are gated communities or stand-alone complexes, whether there is a common mailroom, or whether they have doormen.[4]  (*Id.*)

## II.    THE ARBITRATING PLAINTIFFS[5]

The Arbitrating Plaintiffs—Mr. Flowers, Ms. Brown, and Ms. Fakunle—agreed to arbitrate all claims arising from or relating to UPS services when they enrolled in UPS My Choice, which is a UPS service that gives members more flexibility and control over package deliveries.  (*See generally* Declaration of Glenn King in Support of Defendant UPS's Motion to Dismiss and Compel Arbitration) ("King Decl.")[6]  To enroll in UPS My Choice, the Arbitrating Plaintiffs were required to agree to the UPS My Choice Terms.  Those terms incorporate a

---

[4] While the Amended Complaint alleges that UPS should "provide the same service to Park Hill and Fox Hill that it provides to other multi-family residences on Staten Island," it fails to address that UPS does *not* provide identical service to all multi-family residences in New York City, or even on Staten Island. Nor could it.  "Multi-family residences" on Staten Island range from two-family brownstones to the largest complexes like Park and Fox Hill Apartments.  Each building, including the "similarly situated" buildings Plaintiffs purport to identify, differs significantly from an operational perspective.  For example, one of the "similarly situated" buildings that Plaintiffs allege specifically advertises its "Large mailroom" as an amenity. *See* (Am. Compl. ¶ 60); *Amenities*, Hylan Dartmouth Staten Island Apartments (last accessed May 5, 2025), https://hylandartmouth.com/amenities/.  Another "similarly situated" building advertises full-time doormen.  *See* (Am. Compl. ¶ 53); *The Accolade*, StreetEasy (last accessed May 5, 2025), https://streeteasy.com/building/the-accolade.

[5] The following facts are taken from the attached Declaration of Glenn King, which the Court may consider in deciding the present arbitration-related arguments.  *See N. Shore Linen, Inc. v. Carotenuto*, No. 18-cv-04944, 2019 WL 13554614, at *4 (E.D.N.Y. Aug. 28, 2019) ("In determining a motion to compel arbitration, the court applies a standard similar to a motion for summary judgment.") (quoting *Bensadoun v. Jope-Riate*, 316 F.3d 171, 175 (2d Cir. 2003)); *Wojcik v. Midland Credit Mgmt., Inc.*, No. 18-cv-3628, 2019 WL 3423567, at *1 n.2 (E.D.N.Y. July 30, 2019) ("In deciding the motion to compel arbitration, the Court considers the factual allegations in the Complaint, the document attached thereto, and the affidavits submitted in support of the motion to compel arbitration.") (citing *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)).

[6] As a part of the benefits, a UPS My Choice member may receive alerts from UPS regarding packages scheduled for delivery to the address associated with the membership, reschedule home deliveries to a different day, or redirect packages to a more convenient location, such as the UPS My Choice member's place of work or a nearby UPS Access Point location. (King Decl. ¶ 4.)  Membership in UPS My Choice is optional, and enrollment is free of charge, unless the member elects to enroll in a premium membership.  (*Id.*)

-6-

second contractual agreement, the UPS Tariff/Terms, by reference.  As the UPS My Choice Terms expressly disclose, the UPS Tariff/Terms contain an agreement to arbitrate disputes like this one before the American Arbitration Association.  (*Id.* ¶¶ 33–35.)

> **A.** **The Arbitrating Plaintiffs Agreed to Arbitrate Their Claims by Enrolling in UPS My Choice.**

UPS records indicate that Mr. Flowers enrolled in UPS My Choice on June 11, 2020; Ms. Fakunle enrolled on May 23, 2020; and Ms. Brown enrolled on November 5, 2019.  (*Id.* ¶¶ 12, 20, 21.)  Customers can enroll in UPS My Choice through UPS's website (whether mobile or desktop version) or the UPS App.  (*Id.* ¶ 6.)  Regardless of how a customer enrolls, however, they must first check a box and click a button to signify agreement to the UPS My Choice Terms.  (*Id.*)  Adjacent to the checkbox is a conspicuous hyperlink to download and view a copy of the UPS My Choice Terms.  (*Id.*)  While the exact layout changed slightly between November 2019 and May/June 2020, the approach—presentation of a hyperlinked copy of the UPS My Choice Terms and a mandatory checkbox members had to click to manifest their assent—did not change.  (*Id.*)

For individuals enrolling in UPS My Choice via UPS's desktop website in November 2019, when Ms. Brown enrolled, the pertinent portion of the enrollment screen would not have been materially different from the screen that follows, including the hyperlink "Download the UPS My Choice Service Terms" in bolded blue contrasting font:

Download the UPS My Choice® Service Terms

☐ I accept the UPS My Choice® Service Terms.

☐ Make this my default profile address.

**Next**

(*Id.* ¶¶ 14–15.)

For members enrolling in UPS My Choice via UPS's desktop website in May and June 2020, when Mr. Flowers and Ms. Fakunle enrolled, the pertinent portion of the enrollment screen appeared as follows, including a hyperlink to "UPS My Choice Terms of Use" in blue, underlined font:



(*Id.* ¶ 25.)

If a person enrolled in UPS My Choice through UPS's mobile website when any of the Arbitrating Plaintiffs enrolled, they would have followed the same process described above, where they had to click a checkbox indicating their agreement to the UPS My Choice Terms to proceed with enrollment. (*Id.* ¶¶ 16, 26.) The layout of the checkbox on the mobile website was substantially similar to the desktop screens depicted above in that the checkbox appeared near the "Next" or "Submit" button and users were required to select it in order to proceed. (*Id.*)

Likewise, the process for enrolling in UPS My Choice through the UPS App when any of the Arbitrating Plaintiffs enrolled was similar. (*Id.* ¶¶ 18, 28.) To complete enrollment, the

-8-

customer had to check a box indicating agreement to the UPS My Choice Terms.  (*Id.*)  To the right of the checkbox was a hyperlink to view the UPS My Choice Terms.  (*Id.*)  For members enrolling in UPS My Choice via the UPS App in November 2019, May 2020, or June 2020, the pertinent portion of the enrollment screen would not have been materially different from the screen that follows:



(*Id.*)

By enrolling through any of the above methods during the specified time periods, a prospective UPS My Choice member could have navigated to a copy of the UPS My Choice Terms by clicking the blue, hyperlinked words "Download the UPS My Choice Service Terms" or "UPS My Choice Terms of Use."  (*Id.* ¶¶ 14–19, 25–32.)  The UPS My Choice Terms that were in effect when the Arbitrating Plaintiffs enrolled "expressly incorporate[d] here by this reference" the "UPS Tariff/Terms and Conditions of Service."  (*Id.* ¶ 33.)

The UPS My Choice Terms also informed enrolling members that "[t]he most current and controlling version[]" of the UPS Tariff/Terms was "published at ups.com and . . . accessible

-9-

via" hyperlinks included directly in the UPS My Choice Terms.  (*Id.*)  The same paragraph

provided that the UPS Tariff/Terms "include[] an Agreement to Arbitrate Claims providing for

binding arbitration of claims on an individual basis," and that the agreement to arbitrate "can be

viewed by clicking the link" provided in the UPS My Choice Terms.  (*Id.*)  Additionally, the

UPS My Choice Terms provided that enrolling members "expressly acknowledge having

reviewed, understood and agreed to the UPS Tariff" and "accept their application."  (*Id.*)  In full,

the first section of the UPS My Choice Terms reads as follows:

> US Rev. July 13, 2015
>
> ### UPS MY CHOICE® SERVICE TERMS
>
> **(1) Governing Terms.**  These Service Terms ("Terms") govern your use of UPS My Choice services (the "Service").  Except as modified by these Terms, the UPS Tariff/Terms and Conditions of Service ("UPS Tariff"), the UPS Rate and Service Guide ("UPS Guide) and the description of the Service available at ups.com/mychoice in effect at the time of service (all of which are subject to change without notice) govern the Service, and are expressly incorporated here by this reference.  The most current and controlling versions of the UPS Tariff and the UPS Guide are published at ups.com and are accessible via http://www.ups.com/content/us/en/resources/ship/terms/service.html (UPS Tariff) and http://www.ups.com/content/us/en/shipping/cost/zones/index.html (UPS Guide).  The UPS Tariff includes an Agreement to Arbitrate Claims, providing for binding arbitration of claims on an individual basis (except as otherwise provided).  The Agreement to Arbitrate Claims contained in the UPS Tariff can be viewed by clicking the link to the UPS Tariff above and also is available at http://www.ups.com/content/us/en/resources/ship/terms/claims-legal-action.html.  You expressly acknowledge having reviewed, understood and agreed to the UPS Tariff and the UPS Guide and accept their application.  In the case of a conflict between the terms of the UPS Tariff or the UPS Guide on the one hand, and these Terms on the other, these Terms shall control as to the Service.
>
> By using the Service, you agree to these Terms.

(*Id.*, Ex. A at 1.)

No matter how the Arbitrating Plaintiffs enrolled in UPS My Choice—whether through

the UPS website (on a computer or a mobile device) or the UPS App—they could not have

completed enrollment without having access to and agreeing to the UPS My Choice Terms,

which incorporate the UPS Tariff/Terms and the arbitration provision therein.  (*Id.* ¶ 6.)

**B.**    **The UPS Tariff/Terms Include a Binding Arbitration Provision.**

The UPS Tariff/Terms, as incorporated into the UPS My Choice Terms, provide "the

general terms and conditions of contract under which [UPS] is engaged in the transportation of

ny-2931839

Package shipments itself and jointly through interchange with its affiliates[.]" (*Id.*, Ex. B § 1; Ex. C § 1.) At all times pertinent to the Arbitrating Plaintiffs' claims, the UPS Tariff/Terms included an agreement to arbitrate all disputes arising from or related to the provision of services by UPS on an individual basis. (King Decl. ¶ 35.) Section 55 of the UPS Tariff/Terms was bolded and titled "**Claims and Legal Actions: Individual Binding Arbitration of Claims**." (*Id.*, Ex. B § 55; Ex. C § 55.) In relevant part, Section 55 provided:

> **Agreement to Arbitrate Claims. Claimant and UPS agree that, except for disputes that qualify for state courts of limited jurisdiction (such as small claims, justice of the peace, magistrate court, and similar courts with monetary limits of less than $30,000 on their jurisdictions over civil disputes), any controversy or claim, whether at law or equity, arising out of or related to the provision of services by UPS, regardless of the date of accrual of such dispute, shall be resolved in its entirety by individual (not class-wide nor collective) binding arbitration.**

(*Id.*; King Decl. ¶ 35.)

The UPS Tariff/Terms defined "Claimant" as "any person asserting any claim in any forum for legal or equitable relief … arising out of or related to the provision of services by UPS." (King Decl. ¶ 36.) This section further provided in bolded type that "**Claimant and UPS are each waiving the right to trial by jury.**" (*Id.*) Also contained in Section 55 of the UPS Tariff/Terms were several acknowledgments, all capitalized, which include:

> – CLAIMANT AND UPS AGREE THAT WE ARE WAIVING THE RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST CLAIMANT, UPS OR RELATED THIRD PARTIES;
>
> – CLAIMANT AND UPS AGREE THAT WE ARE WAIVING THE RIGHT TO HAVE A COURT, OTHER THAN A STATE COURT OF LIMITED JURISDICTION AS DEFINED ABOVE, RESOLVE ANY DISPUTE ALLEGED AGAINST CLAIMANT, UPS OR RELATED THIRD PARTIES;

-11-

– CLAIMANT AND UPS AGREE THAT WE ARE WAIVING THE RIGHT TO HAVE A COURT REVIEW ANY DECISION OR AWARD OF AN ARBITRATOR, WHETHER INTERIM OR FINAL, EXCEPT FOR APPEALS BASED ON THOSE GROUNDS FOR VACATUR EXPRESSLY SET FORTH IN SECTION 10 OF THE FEDERAL ARBITRATION ACT.

– CLAIMANT AND UPS AGREE THAT WE ARE WAIVING THE RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, JOIN AS A CLASS MEMBER, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS IN ANY CLASS, MASS, CONSOLIDATED OR COMBINED ACTION OR ARBITRATION FILED AGAINST CLAIMANT, UPS AND/ OR RELATED THIRD PARTIES.

(*Id.* ¶ 37.)

The UPS Tariff/Terms provided that arbitration is to be conducted by the American Arbitration Association in accordance with its Commercial Arbitration Rules and the Supplementary Procedures for Consumer-Related Disputes, with judgment to be entered by any court of competent jurisdiction.  (*Id.*, Ex. B § 55; Ex. C § 55.)  "All issues are for the arbitrator to decide, except that issues relating to the scope, application, and enforceability of the arbitration provision are for a court to decide."  (*Id.*)  The UPS Tariff/Terms further provided that the arbitration shall take place "in the county where Claimant resides" and shall be "determined by a single arbitrator."  (*Id.*)

## ARGUMENT

### I.    THE COURT SHOULD ENFORCE THE ARBITRATING PLAINTIFFS' AGREEMENT TO ARBITRATE THEIR CLAIMS.

The Arbitrating Plaintiffs cannot avoid their agreement to arbitrate disputes with UPS. The Federal Arbitration Act ("FAA") "reflects a legislative recognition of 'the desirability of arbitration as an alternative to the complications of litigation.'"  *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (quoting G*enesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844

-12-

(2d Cir. 1987); *Wilko v. Swan*, 346 U.S. 427, 431 (1953)).  As such, the FAA mandates that arbitration agreements in contracts "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

The "central" purpose of the FAA is to "ensure that 'private agreements to arbitrate are enforced according to their terms.'"  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (quoting V*olt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)); s*ee also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) ("Section 2 [of the FAA] embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts"); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 343–45, 352 (2011) (class action waiver could not invalidate arbitration provision, and to require otherwise would frustrate Congressional purpose).

In line with strong federal policies favoring arbitration, courts enforce arbitration provisions where (1) the parties entered into a valid agreement to arbitrate, and (2) the claims fall within the scope of the arbitration agreement, recognizing that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *See Pool Deals, LLC v. United Parcel Serv., Inc.,* 454 F. Supp. 3d 208, 213 (W.D.N.Y. 2020) (citing *Daly*, 939 F.3d at 421).  Here, the terms and claims satisfy both factors, as numerous courts have found in granting motions to compel based on the arbitration provision in the UPS Tariff/Terms.[7]  Accordingly, the

---

[7] *E.g.*, *Shen v. United Parcel Serv.*, No. 2:21-cv-08446, 2022 WL 17886012, at *3 (C.D. Cal. Nov. 21, 2022) (granting motion to compel arbitration based on UPS Tariff/Terms in effect July 2020); *Sugaberry v. United Parcel Serv.*, No. 2:21-cv-00610, 2022 WL 910945, at *3 (W.D. Wash. Mar. 29, 2022) ) (granting motion to compel arbitration based on UPS Tariff/Terms in effect December 2019); *Pool Deals*, 454 F. Supp. 3d at 213 (W.D.N.Y. 2020) (granting motion to compel arbitration based on UPS Tariff/Terms in effect July 2018); *Hinojosa v. UPS Expedited Mail Services, Inc.*, 2019 WL 948752 (C.D. Cal. 2019) (granting motion to compel arbitration based on UPS Tariff/Terms in effect July 2018).

ny-2931839

Court should enforce the Arbitrating Plaintiffs' agreement to arbitrate.[8]

## A.    The Arbitration Agreement Is Valid and Binding.

Each of the Arbitrating Plaintiffs enrolled in UPS My Choice and unambiguously agreed to the UPS My Choice Terms.  Ms. Brown enrolled in UPS My Choice on November 19, 2019; Ms. Fakunle enrolled on May 23, 2020; and Mr. Flowers enrolled on June 11, 2020.  (King Decl. ¶¶ 12, 20, 21.)  By agreeing to the UPS My Choice Terms, the Arbitrating Plaintiffs each bound themselves to valid and enforceable agreements that require them to arbitrate any dispute with UPS arising out of or relating to UPS's provision of services.  (*See generally* King Decl.)

To complete enrollment in UPS My Choice, the Arbitrating Plaintiffs had to affirmatively check a box indicating they accepted the UPS My Choice Terms, which were made available to the Arbitrating Plaintiffs through adjacent hyperlinks.  (*Id*. ¶¶ 12–29.)  Courts routinely find similar "clickwrap" agreements enforceable.  *See Sollinger v. SmileDirectClub, LLC*, No. 19-cv-5977, 2020 WL 774135, at *2 (S.D.N.Y. Feb. 18, 2020) ("As a general matter, in New York, clickwrap agreements are valid and enforceable contracts.") (cleaned up); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 397 (E.D.N.Y. 2015) ("Almost every lower court to consider the issue has found 'clickwrap' licenses, in which an online user clicks 'I agree' to standard form terms, enforceable.") (cleaned up).  As such, the Arbitrating Plaintiffs agreed to the UPS My Choice Terms by enrolling in UPS My Choice.

## B.    The UPS My Choice Terms Expressly Incorporate the UPS/Tariff Terms and the UPS Arbitration Provision.

The UPS Tariff/Terms, which contain a binding arbitration obligation, are expressly part of the UPS My Choice Terms.  "To determine whether a contract has incorporated a document

---

[8] Even if the Court declines to compel the Arbitrating Plaintiffs to arbitration, their claims (along with those from all the remaining Plaintiffs) should be dismissed as preempted for the reasons described further below.

-14-

by reference, courts look to whether a reasonable person would understand the specific document to be incorporated by reference, in other words, an objective standard." *Miller v. Mercuria Energy Trading, Inc.*, 291 F. Supp. 3d 509, 517 (S.D.N.Y. 2018), *aff'd*, 774 F. App'x 714 (2d Cir. 2019) (quoting *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 47 (2d Cir. 1993)).  In making this determination, courts consider two factors: "(1) whether the allegedly incorporated document is expressly identified and so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt; and (2) whether the language incorporating the document clearly communicates that the purpose of the reference is to incorporate the referenced material into the contract." *Id.* (internal citations and quotation marks omitted).

The Ninth Circuit specifically found that assent to the UPS My Choice Terms includes assent to the UPS Tariff/Terms and the arbitration provision.  *In re Holl*, 925 F.3d 1076, 1084–85 (9th Cir. 2019).  The plaintiff in *Holl* brought a putative class action against UPS but had previously enrolled in UPS My Choice.  *Id.* at 1079.  The district court granted UPS's motion to compel arbitration, finding that the plaintiff assented to the arbitration provision in the UPS Tariff/Terms by agreeing to the UPS My Choice Terms.  *Id.* at 1082.  The Ninth Circuit upheld the district court's determination, finding "[the plaintiff] unequivocally assented to the My Choice Service Terms and those terms clearly incorporated the document containing the arbitration clause in question." *Id.* at 1085.[9]  In so reasoning, the Ninth Circuit observed how

---

[9] Although the version of the UPS My Choice Terms in *Holl* pre-dates the terms that were in effect when the Arbitrating Plaintiffs enrolled, the incorporation of the UPS Tariff/Terms in the version of the agreement the Arbitrating Plaintiffs agreed to is even *more* explicit.  Indeed, as the Ninth Circuit observed in comparing the terms at issue there to the terms at issue here:  "The task of the district court below . . . would be much easier if we were reviewing the current My Choice Service Terms," which "include a hyperlink to the UPS Tariff/Terms and Conditions of Service and expressly inform the user that the incorporated document contains an agreement to arbitrate."  925 F.3d at 1084.  The current version of the UPS My Choice Terms, which the Arbitrating Plaintiffs agreed to, does just that:  It includes a hyperlink

-15-

ny-2931839

there is no "special rule" requiring a contract to "highlight or otherwise bring an arbitration clause to the attention of the consumer to render the clause enforceable." *Id.* at 1083.

So too here, the Arbitrating Plaintiffs "unequivocally assented to the My Choice Service Terms," the terms of which "clearly incorporated the document containing the arbitration clause in question." *Id.  First*, the UPS My Choice Terms expressly identify the UPS Tariff/Terms and even flag for customers that the agreement contains an obligation to arbitrate disputes with UPS. The first paragraph of the UPS My Choice Terms is bolded and titled "**Governing Terms**." (King Decl. ¶ 33.)  As the Governing Terms paragraph makes clear, any user enrolling in UPS My Choice "expressly acknowledge[s] having reviewed, understood and agreed to the UPS [Tariff/Terms] and the UPS Guide and accept their application," which users could access through a hyperlink in the paragraph or through the ups.com website as stated in the paragraph. (*Id.*)

*Second*, the UPS My Choice Terms clearly communicate that the purpose of the reference is to incorporate the UPS Tariff/Terms and specifically the arbitration agreement.  The Governing Terms paragraph informs users that "[t]he UPS Tariff includes an Agreement to Arbitrate Claims, providing for binding arbitration of claims on an individual basis (except as otherwise provided)," and "[t]he Agreement to Arbitrate Claims contained in the UPS Tariff can be viewed by clicking the link to the UPS Tariff above and also is available" at a second link provided, which directs customers to a stand-alone copy of the arbitration provision. (*Id.*)  As such, the UPS My Choice Terms expressly incorporate the UPS/Tariff Terms and its arbitration

---

to the UPS Tariff/Terms and informs users of the agreement to arbitrate.  (King Decl. ¶¶ 33–34.)  As such, while the Ninth Circuit found the earlier version of the UPS My Choice Terms to validly incorporate the arbitration clause, the Court's job here is "much easier" considering the updated language that more explicitly references the current UPS arbitration provision.

ny-2931839

provision, and the Arbitrating Plaintiffs agreed to arbitrate when they enrolled in UPS My Choice.

### C. The Arbitrating Plaintiffs' Claims Fall Within the Broad Scope of the Binding Arbitration Agreement.

Not only have the Arbitrating Plaintiffs agreed to arbitrate, but the broad scope of the arbitration provision plainly covers the present dispute. Section 55 of the UPS Tariff/Terms—the arbitration provision—is titled "Claims and Legal Actions: Individual Binding Arbitration of Claims." (*Id.* ¶ 35.) The arbitration provision provides, in part, as follows and is bolded in the UPS Tariff/Terms:

> **Agreement to Arbitrate Claims. Claimant and UPS agree that, except for disputes that qualify for state courts of limited jurisdiction (such as small claims, justice of the peace, magistrates court, and similar courts with monetary limits on their jurisdictions over civil disputes), any controversy or claim, whether at law or equity, arising out of or related to the provision of services by UPS, regardless of the date of accrual of such dispute, shall be resolved in its entirety by individual (not class-wide nor collective) binding arbitration.**

(*Id.*)

The language here makes clear that except for matters within "state courts of limited jurisdiction," the UPS arbitration provision broadly covers "any controversy or claim, whether at law or equity, arising out of or related to the provision of services by UPS." (*Id.*) Courts have found that arbitration provisions using similar language—such as "any claim or controversy"—are "the paradigm of a broad clause" and create a "presumption of arbitrability." *See Daly*, 939 F.3d at 421 ("In accordance with the strong federal policy favoring arbitration as an alternative means of dispute resolution, [courts] resolve any doubts concerning the scope of arbitrable issues in favor of arbitrability.") (internal quotation marks omitted); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 100 (S.D.N.Y. 2015) ("Indeed, an arbitration clause covering 'any claim or

-17-

controversy arising out of or relating to' an agreement is the paradigm of a broad clause").

Against this legal backdrop, the present dispute regarding UPS's services falls squarely within the broad scope of the arbitration provision.  Plaintiffs allege that UPS "does not provide the same service to two apartment complexes," because instead of UPS delivering inside the buildings at Park and Fox Hill Apartments, residents must "pick up their packages from the truck" at a designated time.  (Am. Compl. ¶¶ 1–4, 30–32.)  In other words, Plaintiffs' entire case is based on challenging the "service" that UPS provides customers at Park and Fox Hill Apartments.  ((*See id.* ¶ 21) (stating "this case arises from" UPS's delivery policy at Park and Fox Hill Apartments).)  Accordingly, because the Arbitrating Plaintiffs agreed to the binding arbitration provision that covers their claims here, the Court should compel each of them to arbitrate their claims on an individual basis, and stay resolution of their claims in this forum.[10]

## II.    TWO FEDERAL STATUTES INDEPENDENTLY PREEMPT PLAINTIFFS' CLAIMS.

Regardless of whether the Court compels arbitration as to the Arbitrating Plaintiffs, all of the claims in the Amended Complaint are barred as to any Plaintiff properly before this Court. Two federal laws preempt *all* the Plaintiffs' claims:  the FAAAA and the Carmack Amendment. The FAAAA broadly preempts any state-law claims that relate to a carrier's service, route, or price; the Carmack Amendment broadly preempts state-law claims arising from a carrier's alleged failure to discharge duties relating to any part of the agreed transportation.  Because Plaintiffs' claims are fundamentally about how UPS delivers packages—the heart of UPS's services—and because granting the relief Plaintiffs seek would directly affect UPS's services,

---

[10] To the extent the Court declines to compel arbitration as to the Arbitrating Plaintiffs, their claims should still be dismissed (along with all claims from the remaining Plaintiffs) because the FAAAA and the Carmack Amendment likewise preempt them.

both the FAAAA and the Carmack Amendment prohibit Plaintiffs from pursuing their state law claims.[11]

> **A.      The FAAAA Preempts State Law Claims, Like Plaintiffs', that "Relate to" a Carrier's Routes or Services.**

Plaintiffs' claims cannot proceed in light of the FAAAA's expansive preemption provision, which prohibits any state claim relating to a carrier's service, routes, or rates. Plaintiffs' claims are not merely related to UPS's services—they are based directly on UPS's core service of package delivery at specific locations.  Even more, the Amended Complaint asks the Court to intervene in how UPS provides delivery service, which the FAAAA prohibits.

Congress enacted the FAAAA in 1994 to deregulate the trucking industry and, in doing so, included a remarkably broad preemption provision that extends to any claims "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).  This language was borrowed from the preemption provision of the Airline Deregulation Act of 1978 ("ADA"), to incorporate "the broad preemption interpretation [of the ADA] adopted by the United States Supreme Court."  *Id.* at 85; *see also Wills v. United Parcel Serv.*, No. 19-cv-01819, 2019 WL 2929985, at *2 (N.D. Cal. July 8, 2019) ("Congress incorporated 'broad preemption' when enacting the FAAAA.").  Congress enacted the FAAAA to protect motor carriers from a "patchwork" of state regulation that created "a huge problem for national and regional carriers attempting to conduct a standard way of doing business" and instead to allow the market to dictate how motor carriers provide services.  H.R. Conf. Rep. No.

---

[11] Furthermore, because preemption raises straightforward questions of law, the Court can dismiss Plaintiffs' claims as preempted without needing to consider facts beyond the Amended Complaint.  *See S & R Dev. Ests., LLC v. Town of Greenburgh, N.Y.*, 336 F. Supp. 3d 300, 308 (S.D.N.Y. 2018) (observing that "all preemption claims are conclusions of law, and are therefore properly decided absent a full factual record") (internal alteration and quotation marks omitted); *Dogbe v. Delta Air Lines, Inc.*, 969 F. Supp. 2d 261, 276 n.8 (E.D.N.Y. 2013) (acknowledging that "legal preemption is a question of law, not of fact").

103-677, at 87–88 (1994), reprinted in 1994 USCCAN. 1715, 1759-60, 1780 (through preemption, Congress intended that "[s]ervice options will be dictated by the marketplace").

Acknowledging the breadth of the "related to" language in the FAAAA preemption provision, the Supreme Court has interpreted the FAAAA to preempt any state law claim "having a connection with, or reference to, . . . 'rates, routes, or services.'" *Morales v. TransWorld Airlines, Inc.*, 504 US 374 (1992); *Am. Airlines v. Wolens*, 513 US 219 (1995); *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008); *see also id.* at 370–71 (summarizing *Morales*'s holdings as "(1) that '[s]tate enforcement actions having a connection with, or reference to, carrier' 'rates, routes, or services are pre-empted,'; (2) that such pre-emption may occur even if a state law's effect on rates, routes, or services 'is only indirect'; (3) that, in respect to pre-emption, it makes no difference whether a state law is 'consistent' or 'inconsistent' with federal regulation; and (4) that pre-emption occurs at least where state laws have a 'significant impact' related to Congress' deregulatory and pre-emption related objectives.") (citations omitted); *Nw., Inc. v. Ginsberg*, 572 US 273 (2014); *see also Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 18 (1st Cir. 2014) ("The 'related to' test [for FAAAA preemption] is purposefully expansive."). The FAAAA preempts not just actions a state may take, but also private state-law claims. *Ginsberg*, 572 US at 285; *see also Lee v. Golf Transportation, Inc.*, No. 3:21-cv-01948, 2023 WL 7329523, at *7 (M.D. Pa. Nov. 7, 2023) (collecting cases).

Courts applying *Rowe* have framed the FAAAA analysis as follows:  A state law claim "is preempted if it expressly references, *or* has a significant impact on, carriers' prices, routes, or services." *Schwann v. FedEx Ground Package System, Inc.*, 813 F.3d 429, *436 (1st Cir. 2016) (*citing Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 17-18 (1st Cir. 2014)) (emphasis added);

ny-2931839

*see also RDK NY Inc. v. City of New York*, No. 21-cv-01529, 2024 WL 4333704, at *11 (E.D.N.Y. Sept. 28, 2024) ("[T]he relevant inquiry is whether enforcement of the plaintiff's claims would impose some obligation on [the defendant] with respect to conduct that, when properly undertaken, is a service.") (citation omitted). Thus, the FAAAA preempts claims—like those asserted here—that expressly refer to carrier services and routes on that basis alone.

It follows that courts have found that the FAAAA preempts claims challenging how carriers deliver packages as relating to "services," regardless of how those claims were styled. For example, in *Rockwell v. United Parcel Serv., Inc.*, the District of Vermont found the FAAAA preempted claims involving UPS's delivery protocol. No. 2:99-cv-57, 1999 WL 33100089, at *1–3 (D. Vt. July 7, 1999). The plaintiff there sued UPS after her son was killed by opening a package containing a pipe bomb, alleging that UPS had a duty to inspect packages prior to delivery for dangerous items. *Id.* at *1–3. The court held all of the claims were preempted because—in challenging how UPS delivers packages—the claims went "to the heart of the services that UPS provides." *Id.* at *2 (internal brackets and quotation marks omitted).

Indeed, the *Rockwell* court reasoned that challenging a "delivery protocol is, beyond purview, inherently a claim against UPS's services which is also preempted." *Id.* Furthermore, because the plaintiff sought to impose a duty that "would fundamentally affect how UPS provides its service," the claims were "squarely within the preemptive language of [the FAAAA]." *Id.* at *3 (imposing the duty that plaintiff sought "would fundamentally affect how UPS provides its service"); *see also Soly v. UPS*, 2002 U.S. Dist. LEXIS 24059, *1 (D. Mass. Aug. 22, 2002) (state-law claims arising from delivery of package with suspected Anthrax preempted under the FAAAA because they "do not merely relate to UPS services, they arise

-21-

directly from core services provided by UPS, going to the heart of the 'services' that UPS provides") (internal quotation marks omitted).

Here too, Plaintiffs' claims do not just "relate to" UPS's services, they directly challenge those services. Through their pleading, Plaintiffs rely on state law to control how UPS can deliver the packages it transports. According to Plaintiffs, UPS discriminates by delivering packages outside an entrance at Park and Fox Hill Apartments at a specific time, instead of directly to the doors of more than 1,400 units across 11 buildings. (Am. Compl. ¶¶ 1–2, 6.) But UPS does not deliver to the door everywhere it provides service—nor does the Amended Complaint allege that it does. It is self-evident that delivery locations are not identical, so delivery service is based on numerous operational factors that vary location to location, including route efficiency, driver safety, package security, and location density and layout. Plaintiffs' challenge to UPS's "delivery protocol" at Park and Fox Hill Apartments goes to "the heart of the services that UPS provides," which falls "squarely within the preemptive language of the FAAAA." *Rockwell*, 1999 WL 33100089, at *2 (internal brackets and quotation marks omitted); *see also Trujillo v. Am. Airlines, Inc.*, 938 F. Supp. 392, 394 (N.D. Tex. 1995), *aff'd sub nom. Trujillo v. Am. Airlines*, 98 F.3d 1338 (5th Cir. 1996) ("It is clear that the acts Trujillo complains of," including "delivery of the package[,] are services within the meaning of [the ADA].").

The relief Plaintiffs seek further reinforces how their claims challenge UPS's services. Plaintiffs ask the Court not just to declare UPS's delivery policy unlawful, but to enjoin UPS from continuing the policy, and to order UPS to provide different delivery services to Park and Fox Hill Apartments. (Am. Compl. at 19–20.) Granting this relief "would necessarily impact directly upon UPS's services," as well as the delivery routes for Park and Fox Hill Apartments. *Rockwell*, 1999 WL 33100089, at *2. If the Court forces UPS to deliver packages directly to the

-22-

more than 1,400 units across 11 buildings at Park and Fox Hill Apartments, the impact would be significant—potentially requiring adjustments to the entire delivery route, personnel requirements, and delivery hours—to account for the time and resources required. In short, granting such relief "would fundamentally affect how UPS provides its service." *Id.* at *3.

It bears noting that the FAAAA does not carve discrimination claims—or any particular category of claims—out of its preemptive scope. The FAAAA simply preempts *all* claims relating to service, route, or price. 49 U.S.C. § 14501(c)(1). Courts have not hesitated to find discrimination claims preempted when they fall within these categories. In *Abadi v. Am. Airlines, Inc.*, for example, the Southern District of New York found state law discrimination claims—including under the NYCHRL—preempted under the ADA. No. 23-cv-4033, 2024 WL 1346437, at *38 (S.D.N.Y. Mar. 29, 2024). In that case, the plaintiff sued airlines for disability discrimination after they allegedly denied him access to flights pursuant to face mask requirements in place at the time. *Id.* at 14, 38. The Court held that the ADA preempted plaintiff's discrimination claim because his claim "implicate[d] a 'service' within the meaning of the ADA." *Id.* at 38. As the court reasoned, "there could be few more items more central to the services that airlines provide than 'access to flights,'" which "is the service that an airline provides." *Id.*; *see also Mass. Delivery Ass'n*, 769 F.3d at *20 (declining to categorically exempt all state labor laws from preemption because "[t]he court must engage with the real and logical effects of the state statute, rather than simply assigning it a label").

Regardless of how Plaintiffs have styled their claims, they "implicate[] a 'service' within the meaning of the [FAAAA]," like the discrimination claims preempted in *Abadi*. 2024 WL 1346437, at *38. Indeed, just as the court there found flight access central to the airlines' services, "there could be few more items more central to the services that [UPS] provide[s] than"

-23-

delivery of packages to customers, which "is the service that [UPS] provides." *Id.* Accordingly, because Plaintiffs' claims go to the heart of UPS's services and seek to impose a duty affecting those services, the FAAAA preempts Plaintiffs' claims and requires dismissal of the entire Amended Complaint.

**B.    The Carmack Amendment Preempts State Law Claims that Arise from Interstate Transportation and Delivery of Goods.**

Separately, the Carmack Amendment preempts Plaintiffs' claims and requires dismissal. The Carmack Amendment exclusively governs an interstate motor carrier's liability for any claims arising from failure to deliver goods as agreed. Thus, because Plaintiffs allege that UPS did not deliver goods in the manner or time frame agreed upon, their claims are preempted—full stop.

Congress passed the Carmack Amendment in 1906 to create a uniform national policy governing carrier liability relating to shipment of goods. *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 73 n.6 (2d Cir. 2001). To accomplish uniformity, the preemptive effect of the Carmack Amendment broadly includes "all losses resulting from any failure to discharge a carrier's duty as to any part of the agreed transportation." *Ga., Fla. & Ala. Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 196 (1916). In other words, "the Carmack Amendment preempts state law claims arising from failures in the transportation *and delivery of goods*." *Smith v. United Parcel Serv.*, 296 F.3d 1244, 1246 (11th Cir. 2002) (emphasis added).

For example, the Eleventh Circuit held the Carmack Amendment preempted claims involving UPS's alleged refusal to deliver packages to a specific home altogether. *Smith*, 296 F.3d at 1246–49. There, plaintiffs sued UPS for allegedly refusing to deliver directly to their home address. *Id.* at 1247. This was despite UPS providing delivery notices for undelivered packages, which one plaintiff could not read, and the plaintiff's inability to drive to the local

-24-

UPS store to retrieve his packages. *Id.* at 1245–46. The Eleventh Circuit held that the Carmack Amendment preempted all of the plaintiffs' claims. *Id.* Specifically, the court concluded that the claims for fraud, negligence, wantonness, and willfulness, were based "on UPS's failure to provide them with particular transportation and delivery services," which "fall squarely within the preemption coverage of the Carmack Amendment." *Id.* (adding that such claims "clearly relate to the delivery of goods"). Plaintiffs' outrage claim likewise fell "squarely within the preemption coverage of the Carmack Amendment because it too [was] based on the same conduct—UPS's failure to deliver packages to the Smiths' home." *Id.* at 1248 (emphasizing that "separate and distinct *conduct* rather than *injury* must exist for a claim to fall outside the preemptive scope of the Carmack Amendment") (emphasis added).

The Carmack Amendment likewise preempts claims that relate to the time it takes to deliver goods. *See Azzil Granite Materials, LLC v. Canadian Pac. Ry. Co.*, No. 23-833, 2024 WL 1827289, at *2 (2d Cir. Apr. 26, 2024) (finding claims that "relate to alleged delays or failure to deliver goods" preempted under Carmack Amendment). For example, in *Azzil*, a plaintiff selling stone products sued railroads for breach of contract and under the Carmack Amendment, following their delay in returning railcars to the plaintiff in a timely manner. *Id.* at *1. After the Eastern District of New York dismissed the breach of contract claims on preemption grounds, the plaintiff argued on appeal that such claims "relate only to the Railroads' 'failure to use 'best efforts' to return railcars within 2 to 4 days,' which are separate and distinct claims from its Carmack claims premised on the Railroads' 'delay or failure to timely delivery stone.'" *Id.* at *2. The Second Circuit disagreed, finding that the "breach of contract claims, at bottom, relate to alleged delays or failure to deliver goods, which are preempted by the Carmack

-25-

Amendment." *Id.* Indeed, the Court added, "[s]uch a claim is likely to arise in the context of claims at the heart of the Carmack Amendment and would not be considered separately." *Id.*

Here, the Carmack Amendment preempts Plaintiffs' claims because they challenge the manner and timeliness with which UPS delivers goods to Park and Fox Hill Apartment residents. (*See, e.g.*, Am. Compl. ¶ 21) ("This case arises from UPS's discriminatory Non-Delivery Policy[.]"); (*id.* ¶ 29) (alleging that "UPS maintains a policy whereby it does not deliver packages to the individual apartment buildings at the Park Hill and Fox Hill [A]partments"); *see Smith*, 296 F.3d at 1247. Plaintiffs allege that UPS failed to deliver packages directly to their buildings, allegedly depriving them of the full benefits of UPS services for which they have paid. (*See, e.g.*, *id.* ¶ 38) (alleging that "customers at Park Hill and Fox Hill do not get the full benefit of this service for which they have paid"). In other words, like the plaintiffs in *Smith* who sued UPS for not delivering packages to their home, Plaintiffs here "base their [claims] on UPS's failure to provide them with particular transportation and delivery services," which "falls squarely within the preemption coverage of the Carmack Amendment." *Smith*, 296 F.3d at 1247–48.[12]

Accordingly, preemption under both the FAAAA and the Carmack Amendment prohibit Plaintiffs' claims.[13]

---

[12] To the extent the Court declines to dismiss all of Plaintiffs' claims as preempted, the claims of the Arbitrating Plaintiffs should nonetheless be stayed pending arbitration.

[13] Although claims from the Arbitrating Plaintiffs should be compelled to arbitration, and the Court should refrain from evaluating their claims on the merits, any arbitrator would nonetheless find the Arbitrating Plaintiffs' claims preempted for the same reasons described herein.

ny-2931839

## CONCLUSION

For the foregoing reasons, the Court should stay claims from the Arbitrating Plaintiffs pending arbitration and dismiss all claims from the remaining Plaintiffs, and therefore the Amended Complaint, in its entirety.

Dated: New York, New York          MORRISON & FOERSTER LLP
       May 8, 2025


                                   By: */s/ Jessica Kaufman*
                                       Jessica Kaufman (Bar No. 4501847)
                                       Tiffani B. Figueroa (Bar No. 5220744)
                                       jkaufman@mofo.com
                                       tfigueroa@mofo.com
                                       250 West 55th Street
                                       New York, NY  10019-9601
                                       Telephone:  212.468.8000
                                       Facsimile:  212.468.7900

                                       Attorneys for Defendant

-27-

ny-2931839

## CERTIFICATE OF SERVICE

Pursuant to Rule III.D of Judge Vitaliano's Individual Motion Practice and Rules, and pursuant to the Minute Order of the Court dated March 24, 2025, I hereby certify that on this 8th day of May, 2025, I caused to be served a true and correct copy of the foregoing document to Plaintiffs' counsel of record via electronic mail, which shall be filed through ECF alongside the fully briefed motion by June 26, 2025.

*/s/ Jessica Kaufman*
Jessica Kaufman

ny-2931839