UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

GORDON FLOWERS, MADELINE BROWN, AMINAT FAKUNLE, YVETTE PEREZ, DULCEMARIA RIVERA, PRINCE THOMAS, JESSIE TORRENCE, and ROHELLE TORRENCE, on Behalf of Themselves and Others Similarly Situated,

Plaintiffs,

-against-

UNITED PARCEL SERVICE, INC.

Defendant.

No. 24-cv-07086

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND DISMISS THE AMENDED COMPLAINT**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ............................................................................................ii-iii

PRELIMINARY STATEMENT ........................................................................................1

FACTS .................................................................................................................................2

    I.     PARK HILL AND FOX HILL ...............................................................2

    II.    UPS'S PICK-UP POLICY FOR PARK HILL AND FOX HILL .........................3

    III.   UPS MY CHOICE....................................................................................6

    IV.   PROCEDURAL HISTORY..........................................................................6

ARGUMENT ......................................................................................................................7

    I.     UPS IS NOT EXEMPT FROM STATE CIVIL RIGHTS LAWS .........................7

         A.    Plaintiffs' Claims Are Not Preempted by the FAAAA ..............................8

             1.     UPS's Discrimination is Outside the
                    Scope of FAAAA Preemption .........................................................10

             2.     Plaintiffs' Claims Address Unreasonable
                    or Outrageous Conduct ...................................................................12

             3.     Plaintiffs' Relief Will Have No Significant
                    Economic Effect on UPS .................................................................13

         B.    Plaintiffs' Claims Are Not Preempted by the
            Carmack Amendment ...............................................................................14

    II.    DEFENDANT'S MOTION TO COMPEL ARBITRATION
         SHOULD BE DENIED .................................................................................16

    III.   ALTERNATIVELY, UPS SHOULD PROVIDE
         ARBITRATION DISCOVERY.....................................................................20

CONCLUSION..................................................................................................................22

i

TABLE OF AUTHORITIES

**Cases**

*Abadi v. Am. Airlines, Inc.,*
No. 23 Civ. 4033, 2024 WL 1346437 (S.D.N.Y. Mar. 29, 2024) .................. 10, 11, 12, 13

*Abdu-Brisson v. Delta Airlines, Inc.*,
128 F.3d 77 (2d Cir. 1997)................................................................................. 8, 9, 14

*Andreadakis v. Ctr. for Disease Control & Prevention*,
No. 3:22 Civ. 52, 2022 WL 2674194 (E.D. Va. July 11, 2022 ....................................... 12

*Azzil Granite Materials, LLC v. Canadian Pac. Ry. Co.*,
No. 23-833, 2024 WL 1827289 (2d Cir. Apr. 26, 2024) ...................................... 14, 15, 16

*Barrows v. Brinker Rest. Corp.*,
36 F.4th 45 (2d Cir. 2022) .......................................................................................... 21

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
6 F.4th 308 (2d Cir. 2021) .......................................................................................... 18

*Desardouin v. United Parcel Serv. Inc.*,
285 F. Supp. 2d 153 (D. Conn. 2003)........................................... 2, 7, 8, 10, 11, 12, 13, 15

*Doricent v. Am. Airlines, Inc.*,
Civ. A. 91-1208Y, 1993 WL 437670 (D. Mass. Oct. 19, 1993)................................. 10, 13

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995)................................................................................................... 17

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
561 U.S. 287 (2010)............................................................................................. 17, 19

*Hayden v. Cnty. of Nassau*,
180 F.3d 42 (2d Cir. 1999)........................................................................................ 11

*Kassner v. 2nd Ave. Delicatessen Inc.*,
496 F.3d 229 (2d Cir. 2007)........................................................................................ 5

*Lewis v. Cont'l Airlines, Inc.*,
40. F. Supp. 2d 406 (S.D. Tex. 1999) ......................................................................... 12

*Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp., Inc.*,
171 A.D.2d 479 (1st Dep't 1991) ............................................................................... 17

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)................................................................................................... 13

*Project Hope v. M/V IBN SINA*,
   250 F.3d 67 (2d Cir. 2001)................................................................................ 14, 15

*Rent–A–Center, West, Inc. v. Jackson*,
   561 U.S. 63 (2010)............................................................................................ 17

*Rockwell v. United Parcel Serv., Inc.*,
   No. 2:99 Civ. 57, 1999 WL 33100089 (D. Vt. Jul. 7, 1999) ........................................ 8, 14

*Rowe v. N.H. Motor Transp. Ass'n*,
   552 U.S. 364 (2008)........................................................................................... 8

*Smith v. United States Parcel Serv.*,
   296 F.3d 1244 (11th Cir. 2002) ............................................................................ 16

*Travel All Over The World, Inc. v. Kingdom of Saudi Arabia*,
   73 F.3d 1423 (7th Cir. 1996) .............................................................................. 8, 13

*Vaughn v. J.P. Morgan Chase Co.*,
   707 F. Supp. 3d 1042 (D. Colo. 2023)............................................................. 18, 19, 20

*Ward v. Allied Van Lines Inc.*,
   231 F.3d 135 (4th Cir. 2000) ............................................................................. 7, 14

*Wexler v. AT&T Corp.*,
   211 F. Supp. 3d 500 (E.D.N.Y. 2016) .................................................................. 18, 19

*Williams v. Richardson*,
   425 F. Supp. 3d 190 (S.D.N.Y. 2019)....................................................................... 5

*Zachman v. Hudson Valley Fed. Credit. Union*,
   49 F.4th 95 (2d Cir. 2022) .................................................................................. 21

**Statutes**

49 U.S.C. § 14501(c)(1)........................................................................................... 8

49 U.S.C. § 41713.................................................................................................. 8

**Other Authorities**

Federal Aviation Administration and Authorization Act of 1994,
   H.R. Conf. Rep. 103-677, 86, 1994 U.S.C.C.A.N. 1715, 1758 ...................................... 7, 9

**PRELIMINARY STATEMENT**

National common carriers—like United Parcel Service, Inc. ("UPS")—cannot insulate themselves from liability for discrimination by invoking federal preemption or overbroad arbitration. On this motion, UPS does not dispute that its policy treats the minority residents of Fox Hill and Park Hill less favorably than other white customers on Staten Island. Instead, UPS argues that its customers cannot challenge that claim here because compelling the company to comply with state anti-discrimination laws would interfere with federal regulations and its own boundless arbitration clause. Neither gambit works.

First, the policy. For more than thirty years, UPS has been treating the residents of Fox Hill and Park Hill apartment complexes differently than other similar apartment buildings and complexes on Staten Island by providing a lower level of service. When residents of Park Hill and Fox Hill have a delivery arriving by UPS, each resident must travel to a pre-set location outside 240 Park Hill Avenue (regardless of which building the resident lives in) and wait for the UPS truck to arrive. Residents must pick up their shipments from UPS, rather than having UPS deliver the shipments to them. Because UPS's pick-up window is 11:00 a.m. to 12:00 p.m., this is particularly unreasonable for residents who work weekdays. UPS's policy treats Park Hill and Fox Hill residents, who are 99% non-white, worse than their neighbors who live in similarly sized buildings with more white residents. On its face, this policy violates the New York City Human Rights Law and State Civil Rights Law.

Plaintiffs' state anti-discrimination law claims are not preempted by the Federal Aviation Administration Authorization Act ("FAAAA") or the Carmack Amendment to the Interstate Commerce Act ("Carmack Amendment"). Plaintiffs' claims are about a racially discriminatory policy—conduct which falls outside that which would be covered by these federal statutes, such as UPS's business decisions about rates, routes or services, or claims for loss or damage during

1

shipping. Although UPS did not mention it, at least one federal court has already rejected UPS's assertion of the identical FAAAA and Carmack Amendment preemption arguments when considering another discrimination claim. *Desardouin v. United Parcel Serv. Inc.*, 285 F. Supp. 2d 153, 162 (D. Conn. 2003). The preemption provisions of these statutes do not give common carriers carte blanche to ignore state anti-discrimination laws, and this Court should reject UPS's efforts to hide behind them in the same way as the District of Connecticut did.

Nor can UPS compel three of the eight Plaintiffs to arbitrate their discrimination claims under the broad Terms & Conditions of a separate program, UPS My Choice. No reasonable consumer would have thought, when they were signing up for a program to receive email notifications about deliveries and an option to reschedule or redirect them, that they were forfeiting the right to bring a claim in court about any issue against UPS and particularly not a race discrimination claim based on a UPS corporate policy.

Finally, should the Court correctly conclude that Plaintiffs' claims are not preempted, the Court could deny the motion to compel without prejudice to allow arbitration-related discovery for the three UPS My Choice Plaintiffs to proceed alongside class discovery for the other five.

**FACTS**

This case challenges the disparate impact caused by UPS's policy requiring the majority minority residents in two apartment complexes on Staten Island to pick up their deliveries from a UPS truck parked outside rather than delivering to their apartment buildings, as UPS does for predominantly white buildings.

## I.    PARK HILL AND FOX HILL

Plaintiffs are residents of Park Hill and Fox Hill apartments in northeastern Staten Island. Am. Compl. ¶¶ 11-18, 21-22. Park Hill and Fox Hill are two adjacent apartment complexes, comprised of 1,400 units across eleven buildings. Am. Compl. ¶ 22-26, 28. As depicted in the

2

following diagram, the Park Hill buildings line a stretch of about a half mile of Park Hill

Avenue, while the Fox Hill buildings are clustered near the northernmost Park Hill building. Am.

Compl. ¶ 22, 26, Figure A. Park Hill and Fox Hill are both privately-owned affordable housing.

Am. Compl. ¶ 22, 25.



Am. Compl. Figure A.

Park Hill and Fox Hill residents are overwhelmingly people of color. 99% of residents

are non-white, and the population is largely Black and Hispanic. Am. Compl. ¶ 27.

## II.    UPS'S PICK-UP POLICY FOR PARK HILL AND FOX HILL

UPS treats Park Hill and Fox Hill differently—and worse—than other similar apartment

complexes in the area. Plaintiffs do not get the benefit of delivery that they have paid for,

because their shipments are not brought to their apartments or even in their buildings—they are

not dropped off *anywhere*. Am. Compl. ¶ 32. Instead, UPS requires these residents to meet a UPS truck parked outside to pick up their shipments. Am. Compl. ¶¶ 29-32. To use this "pick up" system, Park Hill and Fox Hill residents must be available within UPS's pick-up window at 11:00 a.m. Am. Compl. ¶ 30. The pick-up point never changes, and it is up to a third of a mile away from home for some residents. Am. Compl. ¶ 33. As a result, every resident of the more than 1,400 units in Park Hill and Fox Hill must make themselves available at 11:00 a.m. by walking up to a third of a mile to wait outside with no cover for the UPS truck to come and pick up their package.

UPS is the only carrier that maintains this system at Park Hill and Fox Hill. FedEx, Amazon, DHL, and the United States Postal Service all deliver their packages to the interior of each apartment building. Am. Compl. ¶ 41. Yet UPS has maintained this policy for the past *thirty years*. Am. Compl. ¶ 40. Park Hill and Fox Hill residents, including the named Plaintiffs, have advocated for change. Am. Compl. ¶ 72. Yet UPS has refused. Instead, UPS's spokespeople—agents of the company—have referred to decades-old "safety concerns" in public statements defending their policy. Am. Compl. ¶¶ 33 n.3, 72.

UPS does not make other nearby buildings with more white residents comply with this policy. The large complex that includes 655 Tysens Lane, for example, includes at least eight buildings comparable in size to those at Park Hill and Fox Hill. Am. Compl. ¶ 52. This complex is 51% white, and, unlike at Park Hill and Fox Hill, UPS delivers to individual buildings. Am. Compl. ¶ 52. The Amended Complaint highlights nine other buildings or complexes, each six stories or more with more than one hundred units, with an elevator, where UPS does deliver to

4

each building. Am. Compl. ¶¶ 51-61.[1] The difference is that the buildings where UPS does deliver packages to individual buildings and/or units each have more white residents than Park Hill and Fox Hill, which are 99% non-white. Am. Compl. ¶¶ 27, 51-61

The UPS pick-up policy is more than an inconvenience for Park Hill and Fox Hill residents—it has significant adverse impacts. UPS's policy deprives residents of the value of the delivery they have paid for and requires that residents take on additional expenses to receive their packages, simply because of where they live. Even though residents have paid for home delivery, they do not receive the benefits of home delivery.[2] Am. Compl. ¶ 38. Instead, they must line up outside and wait for the truck. For residents who work during the day and those with physical disabilities, accommodating UPS's set pick-up window of 11:00 a.m. to 12:00 p.m. is onerous. Am. Compl. ¶ 33. If residents cannot meet the UPS window, they bear the cost of setting up alternate arrangements, such as having their packages sent to friends, a commercial business, or traveling to the UPS facility to pick up their packages. Am. Compl. ¶ 66.

While residents of other, whiter buildings can sit in comfort in their homes or go to their jobs, confident that their deliveries will make it to their buildings, the predominantly Black and

---

[1]    UPS speculates that there may be distinguishing features in these buildings that render them inapt comparators. *See* Def.'s Mot. to Compel and Dismiss at 5-6 & n.4. Yet at this motion to dismiss stage, the Court must assess Plaintiffs' allegations as pled. *Williams v. Richardson*, 425 F. Supp. 3d 190, 200 (S.D.N.Y. 2019) ("In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor." (citing *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007)).

[2]    UPS mischaracterizes the relief Plaintiffs seek here. Plaintiffs do not seek to dictate *how* UPS delivers to Park Hill and Fox Hill, but just that UPS deliver to them at all. UPS is free to determine whether or not they drop off shipments in central areas of each building or to each individual unit. Plaintiffs do not seek to determine which system UPS utilizes. But under the status quo, UPS simply has arranged a pick-up location, when what Park Hill and Fox Hill residents have requested—and paid for—is at-home delivery. This cannot stand.

Hispanic residents of Park Hill and Fox Hill must line up, wait in all weather, and miss work to receive their shipments.

### III.    UPS MY CHOICE

To gain visibility into what day UPS is expected to deliver a package (particularly necessary if a resident must take off work to pick up the package) or try to re-direct packages to other buildings where UPS will deliver them, individuals can use a service called UPS My Choice. UPS My Choice is a supplemental service—in addition to UPS's delivery service—that purports to give members "more flexibility and control over packages that UPS delivers to them." King Decl. ¶ 4; Def.'s Mot. to Compel & Dismiss ("Def.'s Mot.") at 6. But there is a catch. By selecting to use the UPS My Choice service, participants must opt into a broad arbitration clause.

UPS now claims that three of the eight named plaintiffs (Gordon Flowers, Madleine Brown, and Aminat Fakunle) are members of UPS My Choice. King Decl. ¶ 5. UPS offers no documentation to establish these three individuals are, in fact, My Choice members. *See generally* King Decl. Nonetheless, UPS asserts that, as members of My Choice, they are bound by a broad arbitration provision, notwithstanding that their claims do not relate to the UPS My Choice service. UPS bases this solely on a declaration from Glenn King, an employee in UPS's "Customer Technology Marketing group[.]" King Decl. ¶ 1. UPS offers no supporting documentation to demonstrate that these three people are, in fact, My Choice members.

### IV.    PROCEDURAL HISTORY

Gordon Flowers commenced this case on October 8, 2024. Compl., Dkt. 1. After UPS filed a pre-motion letter concerning a motion to compel arbitration, Dkt. 13, he was granted leave to amend the complaint. Mr. Flowers and seven other named plaintiffs then filed the Amended Complaint on January 8, 2025. Am. Compl., Dkt. 16, ¶¶ 12-18. UPS responded with another pre-

motion letter regarding an anticipated motion to dismiss all Plaintiffs' claims as preempted and to compel arbitration with three of them. Dkt. 18. Following a status conference before Magistrate Judge Marutollo, UPS moved to compel arbitration with those three and to dismiss the entire case as preempted by the FAAAA and the Carmack Amendment.

## ARGUMENT

Both UPS motions should be denied. Plaintiffs' state discrimination claims—based on a hyperlocal UPS policy limited to Park Hill and Fox Hill—are not preempted by federal laws relating to interstate and intrastate commerce. And the UPS Tariff/Terms and Conditions of Service ("UPS T&Cs") arbitration provision does not cover these race discrimination claims. Moreover, should this case proceed to discovery for some of the plaintiffs, the Court should permit arbitration-related discovery to proceed in parallel.

## I.    UPS IS NOT EXEMPT FROM STATE CIVIL RIGHTS LAWS

Laws to prevent policies of racial discrimination are not preempted by the FAAAA or the Carmack Amendment. This case challenges a discriminatory corporate policy that singles out Park Hill and Fox Hill. It is not a quibble about a lost package, nor an attempt to regulate UPS's business choices. UPS's disparate treatment of the minority residents of Fox Hill and Park Hill has nothing to do with Congress's goals of deregulating the trucking industry, Federal Aviation Administration and Authorization Act of 1994, H.R. Conf. Rep. 103-677, 86, 1994 U.S.C.C.A.N. 1715, 1758, curtailing "[s]tate economic regulation of motor carrier operations," *id.* at 87, or establishing a uniform regime for recovery from carriers for lost or damaged shipments. *Ward v. Allied Van Lines Inc.*, 231 F.3d 135, 138 (4th Cir. 2000); *see Desardouin v. United Parcel Serv., Inc.*, 285 F. Supp. 2d 153, 162 (D. Conn. 2003) (rejecting UPS's preemption argument for race discrimination claims). Instead, Plaintiffs seek to ensure that UPS—like any other business operating on Staten Island—treat all its customers the same, regardless of race. Neither the

7

FAAAA, nor Carmack Amendment absolves UPS from its responsibility to treat its customers equally.

**A.      Plaintiffs' Claims Are Not Preempted by the FAAAA**

Plaintiffs' claims are not preempted by the FAAAA. The FAAAA was enacted in 1994 to deregulate the trucking industry. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 378 (2008) (Ginsburg, J., concurring). The statute contains a preemption provision, which precludes the enactment or enforcement of state laws, or claims arising out of state laws, which "relate[s] to a price, route, or service of any . . . carrier[.]" 49 U.S.C. § 14501(c)(1); 49 U.S.C. § 41713; *Rockwell v. United Parcel Serv., Inc.*, No. 2:99 Civ. 57, 1999 WL 33100089, at *1 (D. Vt. Jul. 7, 1999).  The FAAAA's preemption provision was modeled off the language of the Airline Deregulation Act ("ADA"). *Rockwell*, 1999 WL 33100089, at *1; *Desardouin*, 285 F. Supp. 2d at 162.

The FAAAA does not, however, preempt state law claims "merely because they can be said to broadly and generally 'relate to prices or services' only in some tenuous, remote, or peripheral way"—if that were true, "it is *federal law* which is unnecessarily interfering with legitimate *state laws* and policies." *Abdu-Brisson v. Delta Airlines, Inc.*, 128 F.3d 77, 86 (2d Cir. 1997) (emphasis added). Therefore, the "fact that [a] plaintiff's complaint . . . expressly refers to the defendant's 'services' cannot serve as a basis for concluding that [its] state law claims are preempted." *Desardouin*, 285 F. Supp. 2d at 163-64 (citing *Travel All Over The World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1434 (7th Cir. 1996)). Instead, the Second Circuit has recognized that the "[r]elated to" language "appears to be developing . . . to mean whether state law actually 'interferes' with the purposes of the federal statute," such as airline or trucking deregulation. *Abdu-Brisson*, 128 F.3d at 82.

The Second Circuit has emphasized that, "[i]n possible preemption areas where common federal and state interests exist, courts should seek, if possible, some reasonable and uniform accommodation which does not frustrate either the full congressional purposes and objectives or state policies in determining the relationship between federal and state laws." *Id.* at 86.

Enforcing state and local antidiscrimination laws does nothing to frustrate Congress's intent in passing the FAAAA. Congress's purpose in enacting the FAAAA's preemption provision was to curtail "state economic regulation of motor carrier operations," since "[t]he sheer diversity of these [state] regulatory schemes is a huge problem for national and regional carriers attempting to conduct a standard way of doing business." H.R. Conf. Rep. 103-677, 87-88 (explaining this patchwork of state regulations "causes significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology[,] and curtails the expansion of markets"). One example of the problem the FAAAA was designed to solve is carriers facing "rates for shipments within a state exceed[ing] rates for comparable distances across state lines," which led to carriers "frequently ship[ping] goods across state lines and back into the state of origin to avoid the higher rates for purely intrastate shipments." *Id.* The preemption provision therefore serves an economic purpose, freeing carriers from the burden of abiding by a patchwork of inconsistent and/or illogical state regulations that impacted their prices and services. That is something wholly separate and apart from civil rights legislation.

Here, the FAAA does not preempt Plaintiffs' claims for three reasons: (1) these claims are outside the scope of FAAAA preemption; (2) these claims also fall within the FAAAA's carveout for "unreasonable" or "outrageous" conduct; and (3) the economic impact of remedying this discrimination does not rise to the level that would justify preemption.

9

### 1.    UPS's Discrimination is Outside the Scope of FAAAA Preemption

Although the FAAAA's preemption provision is broad, it is not unlimited. Courts in this Circuit and elsewhere have recognized that state law claims addressing discrimination can fall outside the scope of the preemption provision. This is logical: "Racial discrimination . . . ha[s] nothing whatsoever to do with any legitimate or quasi-legitimate industry-wide practice of [carriers]. Imposing liability for such conduct under [state] law is not shown to in any way 'significantly impact' a [carrier's] ability to administer services, or set rates and routes." *Doricent v. Am. Airlines, Inc.*, Civ. A. 91-1208Y, 1993 WL 437670, at *5 (D. Mass. Oct. 19, 1993). Even in *Abadi v. Am. Airlines, Inc.*, upon which UPS heavily relies, the court recognized that "[c]laims of discrimination also may not be preempted, for intentional discrimination is outside the normal scope of an airline's operations." No. 23 Civ. 4033, 2024 WL 1346437, at *37 (S.D.N.Y. Mar. 29, 2024).

Faced with similar state law race and national origin discrimination claims against UPS, the District of Connecticut in *Desardouin* concluded that the plaintiff's claims were not preempted, even though they were based on his claim that UPS failed to provide him with equal service. 285 F. Supp. 2d at 161-64. There, the plaintiff (a Black man) brought discrimination claims against UPS for its refusal to make deliveries to his store in accordance with the typical shipment "collect on delivery ("C.O.D.")" practices, *id.* at 155-56, a UPS driver's remarks that he suspected the plaintiff did not have enough money to pay for the merchandise delivered and other racially charged comments. *Id.* at 155, 157. The court concluded that the plaintiff's claims, even though they "expressly refer[red] to the defendant's services," were not preempted. *Id.* at 163. The court explained that, even if "the facts alleged in the complaint may relate tangentially to the services and prices of the defendant," "to the extent that the claims are premised on

10

unreasonable conduct that is unnecessary to the provision of a service, they are not preempted." *Id.* at 164 (cleaned up).

Here too, Plaintiffs' claims are based on UPS's policy of treating Fox Hill and Park Hill less favorably than similar buildings in the same area, which is unnecessary to its provision of carrier services for shippers throughout the country. Likewise, the fact that the Amended Complaint refers to UPS's services does not render the claims preempted. Just as in *Desardouin*, Plaintiffs' claims are about more than a one-off instance of delayed or refused service. Instead, Plaintiffs challenge a discriminatory corporate practice—a derivation from UPS's normal service—not merely a challenge to UPS's day-to-day services. And UPS's policy is not a broad policy applicable to all customers, as was the mask mandate in *Abadi*, 2024 WL 1346437, at *38. It is a policy that singles out Park Hill and Fox Hill residents to receive worse services than their neighbors.[3]

Unlawful discrimination categorically is not part of UPS's "services." Rather, the conduct at issue here is UPS's thirty-year-long policy of refusing to provide equal service to buildings in two apartment complexes that are 99% non-white, Am. Compl. ¶ 27, despite repeated and longstanding advocacy from residents for equal treatment, Am. Compl. ¶ 72, despite delivering to individual apartment buildings in similarly situated complexes nearby with a higher percentage of white residents, Am. Compl. ¶¶ 50-62 and using racially charged language about vague "safety concerns" when justifying this policy in the media. Am. Compl. ¶¶

---

[3]    Whether UPS provides other apartment complexes around the country with inferior (or discriminatory) service like Park Hill and Fox Hill (as it suggests, Def's Mot. at 6 n.4), that is an issue for discovery; not a motion to dismiss. *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999) ("In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").

33 n.3, 72. This discriminatory corporate policy implicates matters beyond the daily services UPS provides. It falls outside the scope of the FAAAA's preemption provision.

### 2.    Plaintiffs' Claims Address Unreasonable or Outrageous Conduct

Plaintiffs' claims also fall within the well-recognized carveout of the FAAAA's preemption provision for "unreasonable" or "outrageous" conduct. Courts within this circuit recognize that, even where a plaintiff's claims do implicate a carrier's "service," certain levels of "outrageous" or "unreasonable" conduct can "allow [the plaintiff] to escape preemption." *Abadi v. Am. Airlines, Inc.*, 2024 WL 1346437, at *38 (S.D.N.Y. Mar. 29, 2024) (quoting *Andreadakis v. Ctr. for Disease Control & Prevention*, No. 3:22 Civ. 52, 2022 WL 2674194, at *11-12 (E.D. Va. July 11, 2022)). In *Desardouin*, the court—in the context of analyzing claims of racial discrimination—explained that "to the extent that the claims are 'premised on unreasonable conduct that is unnecessary to the provision of a service,' they are not preempted." 285 F. Supp. 2d at 164 (quoting *Lewis v. Cont'l Airlines, Inc.*, 40. F. Supp. 2d 406, 412 (S.D. Tex. 1999)).

Here, UPS's policy is unreasonable and outrageous. UPS has, for three decades, required residents of Park Hill and Fox Hill, complexes comprised of 99% non-white residents, to wait outside to pick up their shipments from a UPS truck rather than having the full benefit of the at-home delivery service residents have paid for. UPS has maintained this policy even though it delivers to individual buildings in complexes nearby with more white residents and even though all other carriers deliver inside the buildings at Park Hill and Fox Hill.

UPS relies heavily on one case in support of its remarkable position that its conduct should be insulated from scrutiny. But *Abadi* cannot bear the weight UPS places on it. UPS's policy here is far more outrageous and unreasonable than the airline mask mandate policy in *Abadi*, which the court held was reasonable. Acknowledging this carveout, *Abadi* fairly concluded that a mask requirement on airlines (in the face of "a Presidential statement regarding

12

the importance of mask wearing to public health and a federal mandate requiring the wearing of masks") was reasonable. 2024 WL 1346437, at *38. This was particularly so where the airlines had policies by which passengers could apply for an exemption to this policy. *Id.* When the plaintiff "merely claim[ed]" that the defendants "applied their mask mandates to him just as they would to any passenger and, in those instances when he did not qualify for an exemption, denied the exemption," the plaintiff brought no claim for unreasonable or outrageous conduct. *Id.* Here, by contrast, UPS subjects all the overwhelmingly minority residents in Fox Hill and Park Hill to a degrading and discriminatory policy out of step with the service it provides to other, white customers in the same geographic location. There is no rationale or justification for this program, presidential or otherwise.

### 3.    Plaintiffs' Relief Will Have No Significant Economic Effect on UPS

Finally, the claims here are outside the scope of those the FAAAA was designed to preempt, since this case will have no significant economic impact on UPS.

Courts hesitate to find state law claims preempted by the FAAAA or ADA where they do not have the "forbidden significant economic impact" on the common carrier or airline. *Desardouin*, 285 F. Supp. 2d at 164 (quoting *Travel All*, 73 F.3d at 1433); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 388 (1992) (holding a state restriction preempted where it was "clear as an economic matter" that the restrictions "have the forbidden significant effect upon fares"). This hesitancy is consistent with the purpose of the FAAAA to "further efficiency, innovation, and low prices" by "maximum reliance on competitive market forces." *Id.* at 378 (cleaned up); *cf. Doricent*, 1993 WL 437670, at *5 (finding "no evidence" that "recognition of [the plaintiff's] claims will frustrate in any way the purpose of the [ADA] to promote 'competitive market forces'" (quoting *Morales*, 504 U.S. at 378)). But "whether a[]

13

[carrier] discriminates on the basis of age (or race or sex) has little or nothing to do with competition or efficiency." *Abdu-Brisson*, 128 F.3d at 84.

Granting the relief Plaintiffs seek, based on their race discrimination claims, would have no significant impact on UPS's functioning. This is in stark contrast to *Rockwell*, where the plaintiff claimed that UPS's standard method of inspecting packages was inadequate and failed to prevent the shipment of a pipe bomb that killed her son. 1999 WL 33100089, at *1. A ruling in the plaintiff's favor, the court reasoned, would hold that the means by which UPS "segregat[ed], sort[ed], screen[ed] and organiz[ed] its *billions of packages*" was unlawful, and would "necessarily impact directly upon UPS's services and pricing." *Id.* at *3 (emphasis added). Here, by contrast, Plaintiff seeks only that UPS treat two apartment complexes in Staten Island the same way that it treats neighboring complexes. UPS is a national business; Park Hill and Fox Hill represent an infinitesimally small percentage of its economic reality. That limited economic impact is reason alone to allow these claims to proceed.

### B.       Plaintiffs' Claims Are Not Preempted by the Carmack Amendment

Plaintiffs' claims are not preempted by the Carmack Amendment because they do not apply to lost or damaged goods.

While the Carmack Amendment has a preemption provision, it does not preempt every possible claim against a carrier. Rather, Carmack Amendment preemption is limited to preempting "state and common law claims against a carrier for loss or damage to goods during shipment." *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 73 n.6 (2d Cir. 2001) (quoting *Ward v. Allied Van Lines Inc.*, 231 F.3d 135, 138 (4th Cir. 2000)); *Azzil Granite Materials, LLC v. Canadian Pac. Ry. Co.*, No. 23-833, 2024 WL 1827289, at *1 (2d Cir. Apr. 26, 2024). "[T]he Carmack Amendment," the Second Circuit has explained, "addresses the subject of carrier liability for goods lost or damaged during shipment, and most importantly provides shippers with

14

the statutory right to recover for the actual loss or injury to their property caused by any of the carriers involved in the shipment." *Id.* (cleaned up).

In enacting the Carmack Amendment, "Congress intended to provide interstate carriers with reasonable certainty and uniformity in assessing their risks and predicting their potential liability, and did this," *inter alia*, "by preempting the shipper's state and common law claims against a carrier for loss or damage to goods during shipment." *Project Hope*, 250 F.3d at 73 n.6 (cleaned up).

The Carmack Amendment has no application here. Where a "suit does not represent an action . . . for injuries resulting from the loss or damage to an interstate shipment, the Carmack Amendment does not preempt the plaintiff's state law claims." *Desardouin*, 285 F. Supp. 2d at 164. Plaintiffs do not allege that UPS delayed delivering their shipments. Plaintiffs do not allege that UPS lost their shipments. Plaintiffs do not allege that UPS damaged their shipments. Rather, this lawsuit is about UPS's blanket policy requiring all residents of Park Hill and Fox Hill to pick up their packages from UPS at a predetermined time and place, rather than providing residents with the full benefit of the at-home delivery for which they have paid. This discriminatory policy has nothing to do with lost or damaged goods, or even with UPS's failure to deliver goods.

None of UPS's authorities counsel a different result. *Azzil* is irrelevant. There, the plaintiff's claims involved the defendant's failure to timely deliver railcars, which entailed shipping delays and failure to deliver goods. These claims were preempted by the Carmack Amendment because the common law claims "rest[ed] on the same facts and s[ought] the same damages" as the plaintiff's Carmack Amendment claims. 2024 WL 1827289, at *2. In other words, these claims were "likely to arise in the context of claims at the heart of the Carmack

Amendment," and the court declined to "consider[ them] separately." *Id.* Delay is not the problem in this case.

Likewise, *Smith v. United States Parcel Serv.* is inapposite. 296 F.3d 1244 (11th Cir. 2002). There, the plaintiffs alleged that UPS failed to deliver packages to their home entirely after an altercation between the plaintiffs and a UPS driver. *Id.* at 1248 (explaining claims arose out of "UPS's failure to deliver packages to the Smiths' home"), 1249 ("Their claims . . . *all* arise from UPS's failure to deliver their packages." (emphasis added)). In fact, the Eleventh Circuit highlighted that the plaintiffs "allege[d] *no conduct* separate and distinct from UPS's failure to transport and deliver packages." *Id.* at 1249 (emphasis added). Plaintiffs' claims here involve no such delay of shipments, nor do they involve losses incurred from UPS's failure to discharge its duties or make deliveries. Rather, Plaintiffs challenge UPS's policy of treating their complexes worse than other neighboring complexes. These claims are not preempted by the Carmack Amendment.

## II.    DEFENDANT'S MOTION TO COMPEL ARBITRATION SHOULD BE DENIED

Gordon Flowers, Madeline Brown, and Aminat Fakunle should not be compelled to arbitrate their civil rights claims against UPS. UPS moves to arbitrate with these three plaintiffs on the premise that by signing up for UPS My Choice, they agreed to arbitrate "any controversy or claim . . . arising out of or related to the provision of services by UPS." King Decl. ¶ 35.

As a threshold matter, it is an open question for this Court whether any "agreement" to arbitrate can be "voluntary" under the conditions present here. Here, the purported agreement to arbitrate was compelled as a condition of joining UPS My Choice. But UPS My Choice is a supplementary service providing more visibility into customers' UPS deliveries. For residents of Park Hill and Fox Hill, joining UPS My Choice is a means to remedy prejudice from a discriminatory delivery practice caused by UPS, whereby deliveries are not dropped off at

residents' homes. And it bears reiterating that UPS is a company which the three plaintiffs may not have chosen to work with, but that was chosen for them by a vendor they contracted with. UPS should not be able to take advantage of an individual's response to the circumstances *UPS itself created* to prevent that individual from seeking relief in court.

But even if it were not impermissibly coercive, the UPS My Choice arbitration terms are overbroad. Plaintiffs' discrimination claims have nothing to do with UPS My Choice and, as a result are not covered by the My Choice arbitration provision.

Courts enforce both narrow and broad arbitration clauses, but not every dispute falls within even a broad arbitration clause. Courts police the outer bounds of arbitration provisions. This is for the simple and fundamental reason that a party cannot be compelled to arbitrate a dispute that he did not agree to submit to arbitration. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) ("[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." (emphasis in original) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995))).

In determining whether parties agreed to arbitrate a particular dispute, courts recognize that the Federal Arbitration Act ("FAA") "reflects the fundamental principle that arbitration is a matter of contract." *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Therefore, "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944 (1995). It is axiomatic that New York State contract law requires a meeting of the minds to determine a contract is enforceable. *Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp., Inc.*, 171 A.D.2d 479, 483 (1st Dep't 1991) ("[A]n essential element of any contract is a mutual intent to be bound.").

17

Here, the arbitration provision at issue is overly broad, governing "any controversy or claim . . . arising out of or related to the provision of services by UPS," Ex. B to King Decl., at 27; Ex. C to King Decl., at 27, and survives the termination of the agreement, *see* Ex. B to King Decl. at 27 ("[R]egardless of the date of the accrual of such dispute . . . ."); Ex. C to King Decl. at 27 (same). Neither the plaintiffs—nor any reasonable consumer—would have thought that by checking a box to enroll in UPS My Choice, they would be waiving the right to litigate unrelated discrimination disputes.[4] Where, as here, defendants seek to compel arbitration of claims that arise on the outer bounds of broad arbitration agreements, courts will refuse to grant those motions—as detailed in two examples, *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 502 (E.D.N.Y. 2016), and *Vaughn v. J.P. Morgan Chase Co.*, 707 F. Supp. 3d 1042, 1046-47 (D. Colo. 2023).

In *Wexler*, the court rejected a motion to compel arbitration based on a provision that was "not limited to disputes concerning" the agreement in which it was situated. 211 F. Supp. 3d at 502. The court criticized the broad arbitration provision that pulled in "any and all disputes and claims" as unenforceable both as a matter of contract formation and unconscionability. *Id.* at 501, 503. The court held that "no reasonable person would think that checking a box accepting the 'terms and conditions' necessary to obtain cell phone service would obligate them to arbitrate literally every possible dispute he or she might have with the service provider." *Id.* at 503-4 (explaining that "absurd results" would arise from this interpretation, such as "if [plaintiff] were hit by a [defendant's] delivery van, or if she tripped over a dangerous condition in [defendant's]

---

[4]    The UPS T&Cs explicitly grant this Court the power to determine whether the dispute is arbitrable. Ex. B to King Decl., at 27; Ex. C to King Decl., at 28. *Contra DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 316 (2d Cir. 2021) (parties "may . . . contract to have arbitrators (rather than a court) decide whether a particular dispute is to be arbitrated under the terms of the contract" (citation omitted)).

18

store, her tort claim would have to go to arbitration"). Here, the arbitration provision raises similar concerns. Although the provision in the UPS T&Cs does not purport to bind third parties, it purports to cover "any controversy or claim . . . arising out of or related to the provision of services by UPS." Ex. B to King Decl., at 27; Ex. C to King Decl., at 27.  Like in *Wexler*, this arbitration clause "purports to survive termination of the underlying . . . agreement." 211 F. Supp. 3d at 503; *see supra*. Its breadth should not cover the claims here.

Plaintiffs' claims here cannot be pulled in under this arbitration provision. This is not a dispute over a lost or delayed package or a failure of UPS My Choice to accurately provide information about a valuable delivery. This lawsuit is entirely independent of UPS My Choice. A reasonable consumer checking a box accepting the terms and conditions in signing up for UPS My Choice would not think that they were obligated to arbitrate every possible dispute he or she might have with UPS, regardless of whether the dispute arose in connection with UPS My Choice. If the Court here adopts UPS's reading of the arbitration clause, it would reach the same absurd results that the *Wexler* court cautioned against. Plaintiffs' claims are based on an outlier policy, targeted at Park Hill and Fox Hill, by which UPS refuses to provide equal service to a 99% minority complex. *See id.* at 503. No reasonable consumer would think that they were contracting away the right to litigate claims that have nothing to do with the program they were signing up for. The parties have not "agreed to arbitrate *th[is] dispute*." *Id.* at 502 (emphasis in original) (quoting *Granite Rock Co*, 561 U.S. at 297).

Similarly, in *Vaughn*, a district court concluded that a plaintiff's discrimination claim was too far outside the bounds of the arbitration agreement she signed to open a checking account and denied a motion to compel. 707 F. Supp. 3d at 1046-47. There, the plaintiff brought race discrimination claims after she was improperly ejected from a brick-and-mortar branch of a

Chase bank, and the defendant sought to compel arbitration based on an agreement the plaintiff had signed to open her deposit account. *Id.* The court reasoned that it was "simply fortuitous that the parties happened to have a contractual relationship," and the "basis of the claims asserted in Plaintiff's Complaint[,]" including "racial discrimination," had "little or nothing to do with Plaintiff's Chase account, the terms of the Deposit Account Agreement, or the parties' relationship." *Id.* at 1050-51 (cleaned up). The defendants there were not able to "direct[] the Court to a single case involving an arbitration provision that required a similarly situated plaintiff to arbitrate claims of racial discrimination." *Id.* at 1051. Likewise here, Plaintiffs bring claims against UPS for its corporate-level policy that treats residents of a 99% non-white apartment complex differently than neighboring, whiter complexes. The challenged conduct is separate and apart from any plaintiff's decision to enroll in UPS My Choice.

It is understandable that UPS would seek to streamline dispute resolution over the many claims that would inherently arise against a common carrier, such as for a delayed delivery, a lost package, or another error in service. It is understandable that UPS would seek that such claims be subject to arbitration to provide for speedier resolution. But this is not one of those claims. UPS cannot hide behind an arbitration provision to prevent people from vindicating their rights in court concerning a targeted, discriminatory policy against an entire complex of more than 1,400 units.

## III.    ALTERNATIVELY, UPS SHOULD PROVIDE ARBITRATION DISCOVERY

If the Court denies UPS's motion to dismiss, as an alternative to deciding UPS's motion to compel arbitration, it could deny it without prejudice to allow discovery to proceed concerning contract formation of the three purported arbitration agreements contemporaneously with merits discovery—given that UPS has presented no signed contract or other documentation that definitively shows Plaintiffs' agreement to arbitrate.

20

The party seeking to compel arbitration, here UPS, "bears [the] initial burden of demonstrating that an agreement to arbitrate was made." *Zachman v. Hudson Valley Fed. Credit. Union*, 49 F.4th 95, 101-02 (2d Cir. 2022) (collecting cases). "[P]arties that have not agreed to arbitrate claims may not be forced to do so." *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022).

As a result, UPS must demonstrate that an agreement to arbitrate "existed." *Id.* UPS has not met this burden. Its declaration from a marketing officer at the company attaches no documentary evidence showing the three plaintiffs' enrollment in UPS My Choice. *See* King Decl. ¶ 5. Absent evidence of acceptance, UPS is left to conclude with circumstantial evidence that these plaintiffs enrolled in UPS My Choice. This is insufficient. *Compare Barrows*, 36 F.4th at 50 (determining that the defendant's "produc[tion of] an arbitration agreement that appears to bear [the plaintiff's] electronic signature . . . cleared this bar").

Given that UPS has not carried its burden to demonstrate that Mr. Flowers, Ms. Brown, and Ms. Fakunle are UPS My Choice members, the Court should postpone consideration of UPS's motion to compel arbitration until after discovery. Particularly because the case will proceed in court regardless for the other named plaintiffs, UPS will not be prejudiced by doing so, and it will enable both sides to further develop the record on this important issue.

Resolution of the motion to compel arbitration may turn on factual issues. This discovery can and should include the IP address that the particular plaintiff used when purportedly signing up for UPS My Choice, any addresses recorded in UPS My Choice, and/or any emails purportedly sent to the plaintiff as part of his or her membership in UPS My Choice. Should this Court deny UPS's motion to dismiss, it should defer decision on the motion to compel arbitration until after discovery.

## CONCLUSION

This Court should deny UPS's motion to dismiss since Plaintiffs' claims are not preempted by the FAAAA or the Carmack Amendment. This Court should also deny UPS's motion to compel arbitration as to three of the named Plaintiffs or at least defer consideration of the motion and order arbitration-related discovery alongside merits discovery in this case.

Dated: June 12, 2025
      New York, New York

                         EMERY CELLI BRINCKERHOFF
                         ABADY WARD & MAAZEL LLP


                         By: */s/ O. Andrew F. Wilson*
                             O. Andrew F. Wilson
                             Diane L. Houk
                             Laura S. Kokotailo
                             600 Fifth Avenue, 10th Floor
                             New York, New York 10020
                             (212) 763-5000

                         VLADECK RASKIN & CLARK, P.C.
                             Maia Goodell
                             111 Broadway, Suite 1505
                             New York, New York 10006
                             (212) 403-7300

                         *Attorneys for Plaintiffs*

22

## CERTIFICATE OF SERVICE

Pursuant to Judge Vitaliano's Individual Rule III.D. and Judge Marutollo's Order dated March 24, 2025, I hereby certify that I caused to be served a true and correct copy of the foregoing memorandum of law on counsel of record for Defendant UPS via electronic mail on June 12, 2025, and that the foregoing will be filed on ECF alongside the fully briefed motion on or before June 26, 2025.

*/s/ O. Andrew F. Wilson*
O. Andrew F. Wilson